UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| MICHAEL CATANIA ET AL. | CIVIL ACTION 05-CV-1418 |
|---|---|
| VERSUS | JUDGE BRADY |
| ANCO INSULATIONS, INC. ET AL. | MAGISTRATE JUDGE DALBY |

### PHARMACIA'S MEMORANDUM SUPPORTING ITS MOTION TO EXCLUDE SHAEL WOLFSON'S OPINIONS AND FOR PARTIAL SUMMARY JUDGMENT ON ECONOMIC DAMAGES

Plaintiffs' economic expert, Shael Wolfson, candidly admitted that, in a key respect, he did not follow the methodology that he cited in his report. Moreover, even though he did not receive all of the data he requested on one alleged component of Plaintiffs' economic damages, he opined as if that component was entirely lost by Barbara Catania's death, when in fact her death merely changed the timing and amount of economic benefits that Plaintiffs will receive from that component. For both of these reasons, Wolfson's opinions are insufficiently reliable to be admitted pursuant to *Daubert*[1] and its progeny, or alternately certain parts of them are insufficiently reliable. With Wolfson's opinions in whole, or alternately in part, excluded, Pharmacia is entitled to partial summary judgment on those items of Plaintiffs' alleged damages.[2]

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); see also Fed. R. Evid. 702.
[2] See Fed. R. Civ. Proc. 56(b) & (d)(2).

The two main sources of unreliability in Wolfson's opinions are: (1) contrary to the methodology he cited, he reached his estimate of Barbara Catania's personal consumption or personal maintenance—that is, the amount of money spent on her personal needs—by considering only her personal income, instead of the family's total income; and (2) despite requesting—but not receiving—data on the Louisiana State Employees' Retirement System ("LASERS") benefits Plaintiffs are receiving due to Barbara Catania's death, he incorrectly assumed that her death would cause Plaintiffs to lose all LASERS benefits, when in fact it merely changed the timing and amounts of the payments.

### WOLFSON EITHER MISAPPLIED HIS CITED METHODOLOGY, OR APPLIED SOME UNFOUNDED METHODOLOGY, TO ACCOUNT FOR BARBARA CATANIA'S PERSONAL CONSUMPTION.

The Court is probably well aware of principle that the economic damage at issue is (at least in part) the loss of Barbara Catania's financial *support* that Plaintiffs sustained due to her death, which is not the same as simply the loss of her *income*. Obviously some of the family income went to support Barbara Catania personally, over and above the amounts that supported Plaintiffs personally, or paid joint expenses like a mortgage on the family home. The amount that would have gone to things solely for Barbara Catania, that Plaintiffs will not now spend, is her personal consumption, or to use Wolfson's term, "personal maintenance".[3]

The way Wolfson estimated Barbara Catania's personal maintenance is, to a great extent, contrary to the methodology he cited in his report, and he could cite no

---

[3] See, e.g., Wolfson's report, attached as Exhibit 1, p. 2.

2

alternate recognized methodology that is consistent with what he actually did. Wolfson reported,

> Personal Maintenance measures the extent to which decedent absorbed from earnings that may have been necessary to maintain her. We have used a factor as published by Ruble, Patton & Nelson (Journal of Forensic Economics, Volume XV, Number 3) based upon the most recent consumer expenditure survey published by the United States Bureau of Labor Statistics. This factor takes into consideration both family size and family income and is 30%.[4]

Okay, but 30% of what? Wolfson claims that "[t]his factor takes into consideration . . . family income". Indeed the Ruble, Patton, and Nelson (hereafter "Patton") methodology estimates personal consumption as a percent of family income. But Wolfson did not apply any personal maintenance factor to *family* income, he applied it only to Barbara Catania's own personal income—which makes a big difference.

Wolfson's cited Patton methodology explicitly states that the personal maintenance percentages apply to the combined incomes of the whole family. "Table 3 contains the results of calculating the percentage of family income, which would have been consumed by an adult male or female who is now deceased."[5] The accompanying footnote explains, "Income as used here refers to gross family income rather than income after taxes and, includes the gross income of all adults in the family, not just that of the deceased."[6]

---

[4] Exhibit 1, p. 4 (underlining removed).
[5] Exhibit 2, at p. 299 (which is page 5 of Exhibit 2) (footnote omitted).
[6] *Id.* at p. 5, n. 2.

3

Wolfson conceded in his deposition that the Patton methodology estimates personal maintenance or personal consumption as a percent of gross family income, but he, contrary to his chosen methodology, estimated her personal maintenance on a percent of Barbara Catania's income only:

> Q. I understand that's your opinion, but I just want to make sure I understand correctly. The reference you have in your report suggests using 30 percent of the total family income, correct?
>
> A. Correct.
>
> Q. And the total family income would include Mr. Catania's income, correct?
>
> A. Total family income, yes.
>
> Q. And, in fact, you used only 30 percent of her income, correct?
>
> A. To deduct out of her income, yes.
>
>        *      *      *
>
> Q. I guess what I'm getting at is, the reference we have talked about, the reference that you cite says you would take 30 percent of the total family income as her personal maintenance, which would be a larger amount than the amount that she [sic; you] used, correct?
>
> A. Correct.
>
> **Q. So you have—the methodology you used is not the methodology suggested in your reference you cite, correct?**
>
> **A. It's a little different, yes.[7]**

---

[7] See deposition of Shael Wolfson, excerpts of which are attached in globo as Exhibit 3, pp. 41-42 & 44 (emphasis added).

It is more than "a little different", which Pharmacia will address momentarily. But the point is that Wolfson admitted that he did not follow the Patton methodology.

Wolfson's deviation from the Patton methodology is definitely more than "a little different"—it makes a big difference in the value of Plaintiffs' economic damages. Wolfson tried to explain it away by saying that if one uses total family income, instead of only Barbara Catania's own income, the personal maintenance would have been less than 30%. That's technically true, but quite misleading here. The actual numbers from the Patton methodology that Wolfson cited show just what a big difference it makes. Take for example the last full year of Barbara Catania's life, 2004. Wolfson said that Barbara Catania earned $36,587 in 2004.[8] If you take this figure and assume, as Wolfson did, that she consumed 30% of only that amount, that would be $10,976 personal maintenance. Barbara Catania's earnings of $36,587 minus her personal maintenance of $10,976 equals Plaintiffs' loss of support of $25,611. But as explained above, the Patton methodology that Wolfson cited uses total gross family income. The Catanias' 2004 total gross income was $124,219.[9] At that level of income, the Patton methodology indicates that a female in a two-income household has a personal maintenance or consumption of 15.6% of the total family income.[10] If, as the Patton methodology estimates, Barbara Catania's personal maintenance or consumption was 15.6% of total family income,

---

[8] See Exhibit 1, p. 3.
[9] See Exhibit 3, pp. 48-49 (discussing figure from federal income tax return).
[10] See Exhibit 2, p. 5, Table 3; the 15.6% is the figure for the family income level listed ($120,000) that is closest to the actual level ($124,219).

15.6% of $124,219 is her personal maintenance of $19,378. Barbara Catania's earnings of $36,587 minus her personal maintenance of $19,378 equals Plaintiffs' loss of support of $17,209. Compared to the Patton methodology that Wolfson cited, his methodological deviation from it overstates Plaintiffs' loss of support for 2004 by 49% (that is, his $25,611 versus the Patton methodology's $17,209).

So Wolfson obviously deviated very substantially from the Patton methodology that he cited, and his deviation increased his estimate of Plaintiffs' loss of support very substantially (for example, a 49% increase in 2004, as explained above). For this he could cite no alternate methodology, and admitted that his report cites none:

> Q. Would you cite an alternative or a different or a supplemental reference for the methodology that you used?
>
> A. You can look at—you can look at case—I'm just thinking like the Louisiana case. I know this one is, I think, in the USDC. I'm not sure how the law is applied here. There's case law in the State of Louisiana, if you look at it for instance you will find personal consumption deduction rates that range from about 10 percent up to 50 percent. If you are talking about sort of the methodology in general, the methodology of deducting one's personal consumption, you can find that methodology in some of the journals that I have, published in the Journal of Forensic Economics, the earnings analysis, all these journals deal in some respects with different issues of personal consumption.
>
> Q. Is there—just to make it easy, the things that are listed in your report anywhere, you can just say page 10, line 4, whatever, is there any—I understand Louisiana cases may approve or whatever. In terms of economic—in terms of

6

> economic methodologies that are accepted in the professional economics community, is there a reference in your report to one that recommends or suggests or approves the methodology that you actually used to determine the personal maintenance factor?
>
> A. In the report there is no reference other than the reference that was given to that article in subsection E.[11]

Louisiana cases may have approved a wide range of personal consumptions factors, but those depended on the facts of each case, and obviously were heavily influenced by family size and family income. That history is not too relevant here. Wolfson's citation to a methodology that he did not use, and failure to cite a reliable methodology for what he actually did, violated Rule 26's requirement that his report "contain: (i) a complete statement of all opinions the witness will express and the basis and reasons for them [and] (ii) the data or other information considered by the witness in forming them".[12] Indeed, his assertion that he appropriately estimated Barbara Catania's maintenance at 30% of only her own personal income,[13] without any support or foundation, is the sort of "ipse dixit" that *Joiner*[14] and *Kumho*[15] criticize.

Accordingly, because Wolfson failed to either follow the Patton methodology that his report cited or cite a reliable methodology for what he actually did, and his

---

[11] Exhibit 3, pp. 45-47.
[12] Fed. R. Civ. Proc. 26(a)(2)(B).
[13] See, e.g., Exhibit 3, pp. 40-41.
[14] *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997).
[15] *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157, 119 S. Ct. 1167, 1179, 143 L. Ed. 2d 238 (1999).

failure overstated (relative to his cited Patton methodology) Plaintiffs' loss of support by 49%,[16] the Court should exclude his opinions, in whole or alternately in the relevant parts (with relevant parts being anything where Barbara Catania consumed some of her income or services).

> **WOLFSON BASED HIS OPINIONS ON DATA THAT HE KNEW WERE INCOMPLETE, AND THE INCORRECT ASSUMPTION THAT BARBARA CATANIA'S DEATH CAUSED PLAINTIFFS TO LOSE ALL LASERS BENEFITS.**

The second, and completely independent, way in which Wolfson's opinions are substantially unreliable and inaccurate is that he incorrectly assumed that Barbara Catania's death deprived Plaintiffs of all benefits from LASERS, which otherwise they would have indirectly received as support from Barbara Catania, when she received them, had she lived. In fact, Michael Catania is receiving substantial LASERS benefits. Wolfson asked Plaintiffs' lawyers to provide him information on this issue, but they failed to do so.

Clearly Wolfson opined that loss of LASERS benefits is a major part of Plaintiffs' economic damages. The first page of his report states, "Present value of LASERS benefit is $229,101", which is both the biggest single item, and 33% of the total claimed losses of $702,702.[17]

Clearly Wolfson wanted information on the LASERS benefits that Plaintiffs are receiving, and asked Plaintiffs' lawyers for it, but he did not receive it:

---

[16] This is for 2004, and is only an example. Other years may be different. The record is insufficient to support any projection of future loss of support, using the Patton methodology.
[17] See Exhibit 1, p. 1.

> Q. As far as you know, is LASERS providing a survivor benefit to Michael Catania?
>
> A. I'm not sure. I know he may be receiving one. I asked Mr. Clement about that, I think. He said he was going to check on it.
>
> \* \* \*
>
> Q. Now, you said you asked Mr. Clement about survivor benefits from LASERS to Mike Catania. Did he provide you with any information on that?
>
> A. No.
>
> Q. So you didn't consider anything having to do with LASERS benefits payable to the Catanias as a survivor benefit in your report, correct?
>
> A. Correct. What I have there is just the present value of her losses of the benefit as we described after tax, after personal consumption.[18]

Nowhere have Plaintiffs explained why they did not provide Wolfson with this information that he asked for.

But after a discovery dispute,[19] Plaintiffs did finally produce to Pharmacia some documentation on the LASERS benefits that Plaintiffs are in fact receiving. The records show that, for example, as of April 1, 2009, LASERS was sending Michael Catania monthly benefit checks of $1,699.87, based on a gross (pre-tax withholding) benefit of $1,878.41.[20] Plaintiffs admitted that "Michael Catania will continue to receive the LASERS benefit for his life."[21] As an illustration only, which

---

[18] Exhibit 3, pp. 53-54.
[19] See, e.g., Pharmacia's motion to compel, Doc. 150.
[20] See Exhibit 5, p. 10, at the bottom of the page.
[21] Exhibit 4, p. 2.

Pharmacia does not expect the Court to accept as fact or expert opinion, the present value of this benefit, with the 3.5% discount rate that Wolfson used,[22] extended from today through Michael Catania's expected lifespan, is over $350,000.[23] In other words, had Wolfson received the LASERS data he requested and incorporated it into his analysis, he would have very likely found that Plaintiffs sustained no net economic damage due to loss of LASERS benefits. In fact, the LASERS benefits they are now receiving to some extent suffice to offset their other economic losses.

Plaintiffs will claim that the LASERS benefits Michael Catania is receiving are a "collateral source" and therefore not admissible to reduce their economic damages. But how are the LASERS benefits that Wolfson used as a component of his economic damage opinion a collateral source with respect to the LASERS benefits that Michael Catania now receives, and will receive for the rest of his life? They differ only in timing and amount; the source is the exact same source for both: LASERS. LASERS cannot be a collateral source relative to LASERS. Pharmacia submits that the correct measure of damages is the **difference** between the support Plaintiffs would have received when Barbara Catania would have received benefits (i.e., less her personal consumption) and the benefits they are receiving now.

This is not a true collateral source issue, where a party tries to offset privately-purchased life insurance against retirement benefits, or anything like that. A collateral source is a source of monetary benefit other than (and indeed,

---

[22] See Exhibit 1, p. 7.
[23] Simple present values are not too hard to calculate. See Exhibit 3, pp. 76-77.

10

independent from) the source lost or impaired due to the tort. Therefore, LASERS benefits here are not a collateral source for purposes of this issue in this case.

Pharmacia's position—that the damage term related to LASERS is the *difference* between the support Plaintiffs would have received from LASERS and the support they are receiving from LASERS—no more implicates a collateral source than does Wolfson's use of a personal consumption factor for Barbara Catania.[24] There Wolfson correctly explains that the measure of Plaintiffs' damages is not simply her income, but the difference between her income and what she spent and/or caused to be spent on herself: "Earning capacity is first determined; decedent's personal maintenance expenditures are then estimated and subtracted. The residual represents decedent's ability to support, without apportionment among survivors."[25] Here, **the LASERS benefits were never "los[t]" or "impair[ed]"**[26] but merely modified; there is no loss unless the present value of the LASERS benefits that Plaintiffs are receiving is less than the present value of the support they would have received from Barbara Catania's LASERS benefits in the future.

Accordingly, the LASERS benefits Michael Catania receives today are very relevant to any alleged loss he may arguably sustain from Barbara Catania not being alive to collect LASERS benefits (and thereby support him) in the future. Wolfson asked for the current LASERS benefit data, but Plaintiffs failed to provide it. Without taking this into account, Wolfson's opinions are not only clearly

---

[24] See, e.g., Exhibit 1, p. 2.
[25] *Id.*
[26] Exhibit 1, p. 1.

unreliable, but also clearly wrong, and the Court should exclude them, in whole or alternately in the relevant parts.

### CONCLUSION: THE COURT SHOULD EXCLUDE WOLFSON'S OPINIONS FOR TWO INDEPENDENT REASONS.

The two biggest sources of unreliability in Wolfson's opinions are independent of each other, and both are serious. Insofar as the Court agrees with Pharmacia on either, it should exclude substantial parts, if not all, of Wolfson's opinions. Insofar as it excludes Wolfson's opinions on all or part of Plaintiffs' economic damages, it should also grant Pharmacia partial summary judgment on those items of damages.

Respectfully submitted,

Bradley Murchison Kelly & Shea LLC

/s/ David E. Redmann, Jr.
Darryl J. Foster (No. 5,734)
David E. Redmann, Jr. (No. 23,267)
Kimberly C. Delk (No. 28,018)
1100 Poydras St., Suite 2700
New Orleans, LA  70163
504-596-6300
504-596-6301 (facsimile)
asbestos@bradleyfirm.com

Attorneys for Pharmacia Corp.

### CERTIFICATE OF SERVICE

Pursuant to Local Rules 5.3 and 5.7.10, I certify that, as a consequence of electronic filing, copies will be served on all parties or their attorneys by the Court's Electronic Filing System, on or about this 15th day of September 2009.

/s/ David E. Redmann, Jr.