UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MICHAEL CATANIA, ET AL          :          CIVIL ACTION
                                :
VERSUS                          :
                                :
ANCO INSULATIONS, INC., ET AL   :          NO. 05-1418-JJB-DLD

FILED: _____          _____
                                          DEPUTY CLERK

**PLAINTIFFS' OPPOSITION TO PHARMACIA'S
MOTION TO EXCLUDE SHAEL WOLFSON'S OPINIONS
AND FOR PARTIAL SUMMARY JUDGMENT ON ECONOMIC DAMAGES**

Defendant, Pharmacia Corporation (f/k/a Monstano Corporation) ("Pharmacia"), has

filed a motion to exclude the opinions of Shael Wolfson, and a motion asking this Court to grant

Pharmacia's partial motion for summary judgment on, and dismiss Pharmacia with prejudice

from plaintiffs' economic damages claims. Specifically, Pharmacia argues that Shael Wolfson:

(1) failed to follow the publication he cited for his estimate of Barbara Catania's personal

consumption; and (2) he incorrectly assumed that Barbara Catania's death would cause plaintiffs

to lose LASERS benefits from the State Employees' Retirement System. With regard to the

LASERS benefits, this loss was only being claimed by plaintiffs as part of Barbara Catania's

survival action. Because this Honorable Court has dismissed plaintiffs' survival claims,

Pharmacia's motion with regard to the LASERS benefits is moot.[1]  With regard to Pharmacia's

motion as it relates to the personal consumption of Barbara Catania, plaintiffs, Michael Catania,

surviving spouse of Barbara Catania, and Kristen Catania, child of Barbara Catania, respectfully

request that Pharmacia's motion be denied.

## I.   SHAEL WOLFSON'S OPINIONS WITH REGARD TO BARBARA CATANIA'S PERSONAL CONSUMPTION ARE RELIABLE.

Of note, Pharmacia has the burden of establishing that Shael Wolfson's opinions are

unreliable and do not pass *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 125 L.Ed.2d 469, 113 S.Ct.

2786, 2796-97 (1993).  However, Pharmacia has not come forward with any testimony or opinions

from other experts establishing that Mr. Wolfson's estimation of Barbara Catania's personal

consumption is unreliable nor does Pharmacia cite this Court to any cases which have ruled that the

opinions of Mr. Wolfson are unreliable.  This is because Pharmacia's assertions are without merit.

In calculating loss of support, Shael Wolfson utilized the support capacity method derived from the

definition of earning capacity as set forth in the Louisiana Supreme Court case of *Folse v. Facouri,*

371 So.2d 1120 (La. 5/21/79).  (Exhibit "1" - Deposition of Shael Wolfson, at Deposition Exhibit

6 - Expert Report of Shael Wolfson, at p. 3, Paragraph 4(a)).

Shael Wolfson graduated with a B.S. in Economics and Finance from New York University

in 1997.  (Exhibit "1" - Deposition of Shael Wolfson, at Deposition Exhibit 1 - CV of Shael

---

[1]Defendants filed a motion to dismiss plaintiffs' survival action on the basis that it had
prescribed.  This Honorable Court dismissed Barbara Catania's survival action on May 13, 2009.
(Exhibit "5" - Judgment).

Wolfson; Exhibit "2" - <u>Trial Testimony of Shael Wolfson</u>, at p. 146).  Subsequently, Mr. Wolfson obtained a Masters Degree in Economics from Florida State University in 2000 and a Masters Degree in Financial Economics from the University of New Orleans in 2006.  (Exhibit "1" at Deposition Exhibit 1; Exhibit "2" at p. 146).  Presently, Mr. Wolfson is working toward his Ph.D in Financial Economics.  (Exhibit "1" at Deposition Exhibit 1; Exhibit "2" at p. 146).  In the past, Shael Wolfson has taught economics at Southeastern Louisiana University.  (Exhibit "2" at p. 147).  Mr. Wolfson is currently a professor at Xavier University in New Orleans, La.  (<u>Id</u>.).  Mr. Wolfson also has various publications in the field of economics.  (Exhibit "1" at Deposition Exhibit 1; Exhibit "2" at p. 147).  He has also testified in various state and  federal courts in Louisiana, and has never been denied as a witness.  (Exhibit "1" at Deposition Exhibit 1; Exhibit "2" at p. 147).  Plaintiffs submit that Shael Wolfson is qualified to testify in this case as a forensic economist.

First, Pharmacia argues that Shael Wolfson should have used the personal consumption rate which corresponds to the "total family income", which would include both her and her husband's income, as opposed to the personal consumption rate which corresponds to Mrs. Catania's income only.  Next, Pharmacia insists that Mr. Wolfson should have used this personal consumption rate to determine the total amount of family income (including both her and her husband's income) which she would have consumed and then subtract the amount of total family income (her and her husband's income) she would have consumed from her income only.  Clearly, attorney argument by Pharmacia is not expert testimony in support of their argument, and Pharmacia presents no expert

testimony asserting that Mr. Wolfson's opinions are improper.

With regard to personal consumption, Pharmacia fails to even cite this Court to any authority which mandates that an economist must reduce the loss of support award by a personal consumption factor. Although there exists numerous court decisions where economists have reduced loss of support award by the decedent's personal consumption, some courts have affirmed loss of support awards where an economist did not reduce the loss of support award by the decedent's personal consumption. *Humphries, et al. v. Louisiana Department of Public Works, Division of Transportation, et al.,* 545 So.2d 610, 620 (La. App. 3 Cir. 5/24/89), *writ denied*, 548 So.2d 1249 (La. 10/6/89). Nonetheless, Shael Wolfson did consider the personal consumption of Barbara Catania in calculating loss of support. Contrary to defendants' argument, Mr. Wolfson did not deviate from his stated methodology but applied the Patton-Nelson factor in the context of support capacity. It is important to note that the actual personal consumption rate of an individual is not concrete and takes into account various considerations, including food, clothing, and other things needed for subsistence. (Exhibit "1" - Deposition of Shael Wolfson, at p. 38). While there exists various publications which attempt to quantify personal consumption rates for economists to utilize in their calculations, it is important to note that because of the various factors which go into an individual's actual consumption rate, the publications differ on the ways to evaluate personal consumption and also vary on the actual rates of consumption. Accordingly, economists are called upon to use their knowledge, experience, and training to estimate an individual, such as Mrs.

Catania's, personal consumption rate in the context of support capacity.

For example, two other publications which attempt to quantify personal consumption are: (1) Cheit's *Injury and Recovery in the course of Employment*, (Wiley 1970), and (2) U.S. Bureau of Labor Statistics' *Revised Equivalence Scale*. Pharmacia cites no expert testimony or case law which supports the position that Mr. Wolfson's calculation of Barbara Catania's personal consumption rate is unreliable. Pharmacia concedes that Mr. Wolfson's estimation comes from an accepted peer-reviewed publication; however, they simply argue that he used an estimation that was slightly different than the Patton-Nelson publication he cited. Pharmacia's argument that Mr. Wolfson used an alternate unrecognized methodology is incorrect, which is highlighted by the fact that they have not cited anything which indicates that Mr. Wolfson's economic calculation is unreliable. Also, it is important to note that other economists, like Mr. Wolfson, utilize their knowledge, experience, and training in estimating personal consumption. For example, Dr. Kenneth Boudreaux, an economist listed by several defendants in this case, utilizes both of the publications cited above, Cheit's and the US Bureau of Labor Statistics. However, in calculating his personal consumption rate, he follows neither publication exclusively but takes the average of these two consumption rates in performing his loss of support analysis. (Exhibit "3" - Report of Dr. Kenneth Boudreaux in *Danos,* at p. 3)[2]. Of note, Dr. Kenneth Boudreaux does not list in his report in *Danos* authority to

---

[2]Although Dr. Kenneth Boudreaux was listed as an expert in this case, he did not provide an expert report. Accordingly, plaintiffs have attached Dr. Boudreaux's report in *Danos v. Avondale Industries, Inc.*, to memorialize the methodology used by Dr. Boudreaux.

support his use of the average.

Additionally, it is also important to note that there is nothing which prevents an economist from using his knowledge, experience, and training in making a determination of the proper consumption rate. In fact, courts actually recognize that economists are called upon to make this sort of analysis. In *Guidry v. State, DOTD*, 416 So.2d 595, 599 (La. 5 Cir. App. 6/8/82), Dr. Melville Wolfson, an economist, utilized a personal consumption rate of thirty percent (30%) in calculating loss of support. The court noted that Dr. Melville Wolfson had no basic data to determine the decedent's consumption factor and based his thirty percent (30%) on academic study. *Id*. He cited no authority or publications for his estimate of personal consumption. *Id*. As in *Guidry*, economists are often called upon to make these type of estimates based on their background and experience. Clearly, there exists no concrete way to estimate personal consumption rates, as this rate depends on various factors. Likewise, Shael Wolfson explained that because personal consumption is just an estimate and because of the various factors that are involved in an individual's personal maintenance, using thirty percent (30%) as the personal consumption rate for Mrs. Catania was proper. (Exhibit "1" - Deposition of Shael Wolfson, at p. 40-41). Moreover, he confirms that the basis for his opinion is the Patton-Nelson article, which is a peer-reviewed article published in the *Journal of Forensic Economics*. (Exhibit "1" - Deposition of Shael Wolfson, at Deposition Exhibit 6 - Expert Report of Shael Wolfson, at p. 4, Paragraph 4(e)). Plaintiffs submit that Mr. Wolfson has not deviated from his stated methodology. However, even assuming that Mr. Wolfson may have

slightly deviated from the estimates set forth in the Patton-Nelson article, any slight deviation does not render his opinions unreliable, as personal consumption varies for each individual. More importantly, Pharmacia has not cited to any opinions or cases indicating that Mr. Wolfson's estimates are unreliable.

In fact, if Mr. Wolfson would have done as Pharmacia suggests and used the personal consumption rate which corresponds to the "total family income" in 2004 instead of the income of Mrs. Catania only, this would actually cause plaintiffs' loss of support damages to increase. As explained below, using income from only 2004, as Pharmacia suggests, is improper under established economic theory. Nonetheless, using Pharmacia's example in its brief, the personal consumption rate of Mrs. Catania at the "total family income" amount in 2004 is 15.6%. (Exhibit "4" - Patton-Nelson Article, at p. 299). Mr. Wolfson indicated that he attempted to be more conservative with his estimation of personal consumption in this case and had he used the "total family income" personal consumption rate his personal consumption estimation would have decreased. (Exhibit "1" - Deposition of Shael Wolfson, at p. 38-40). The decrease in personal consumption leads to an increase in plaintiffs' loss of support award. Pharmacia's argument that the use of this lower consumption rate would somehow reduce plaintiffs' loss of support award is misplaced. Pharmacia's interpretation of how to use the personal consumption rates is incorrect and lawyer argument. Once you obtain the personal consumption rate, you do not multiply the consumption rate by the total family income to get the actual dollar amount which would then be

subtracted from Mrs. Catania's salary. If one were to accept Pharmacia's method as correct, this would subtract from Mrs. Catania's income that portion of he husband's salary that Mrs. Catania is consuming and give defendants a benefit from causing her death. The proper way to utilize the personal consumption rate is to multiply the personal consumption rate by Mrs. Catania's salary only and subtract this amount from Mrs. Catania's earnings, which is the way Shael Wolfson calculated loss of support and the way other economists in other cases have calculated loss of support, which cases are set forth below. Contrary to defendant's position, you do not multiply the personal consumption rate by the total family income because this would essentially subtract from Michael and Kristen Catania's loss of support those earnings of Michael Catania which Barbara Catania would have presumably consumed had she lived. This analysis by defendant would actually reward a negligent defendant, such as Pharmacia, for contributing to Mrs. Catania's death.

In fact, Mr. Wolfson actually explained how defendant's analysis would be inappropriate. (Exhibit "1" - Deposition of Shael Wolfson, at p. 43). In his deposition, Mr. Wolfson explained as follows:

> Q.    So you did something different than - - you think the methodology suggested in the reference you cite is not appropriate?
> A.    Well, think about this. If the husband earned $200,000, so $200,000 plus, say she earns 40, so 240,000. You take 30 percent of the 240,000, which would be 70,000, whatever it is. You are going to deduct that from her earnings or her support capacity that she lost which means her family would owe you or whoever for killing her.

(Exhibit "1" - Deposition of Shael Wolfson, at p. 43). Clearly, Pharmacia's argument is misplaced

as such a scenario would actually give defendants a benefit from causing her death.

More importantly, it is improper to credit Barbara Catania's consumption of Michael Catania's income against her income, as it violates the collateral source rule. "To hold otherwise, as the defendant would have it, would in effect put the tort-feasor in the position of a third-party beneficiary of the duty of spouses to care for each other imposed by Louisiana law to the detriment of the innocent spouse." *Wright v. United States*, 507 F.Supp. 147, 162 (E.D. La. 1981) (where court held that an injured plaintiff was entitled to an award for future nursing care even though his wife was providing these services instead of professional nursing service).

"Under the collateral source rule, a tortfeasor (Pharmacia) may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." *Bozeman v. Louisiana*, 879 So.2d 692, 698 (La. 7/2/04). A tortfeasor is not entitled to take advantage of compensation received by the plaintiff from an independent source. *Adams v. Schultz*, 250 So.2d 811 (La. App. 4th Cir. 1981). The collateral source rule has been applied to income received from pensions, Social Security disability benefits, insurance benefits, and even Medicare. *Weir v. Gasper*, 459 So.2d 655 (La. App. 4 Cir. 11/14/84), *writ denied*, 462 So. 650 (La. 1/14/85). Plaintiffs submit that Michael Catania's income is also subject to the collateral source rule, and his loss of support award should not be reduced as a result of his own income.

The Louisiana Supreme Court's decision in the case of *Louisiana Department of*

*Transportation and Development v. Kansas City Southern Railway Company*, 2002-C-2349 (La.5/20/03), 846 So.2d 734, addresses the issue of collateral sources of income. The Supreme Court states that:

> **A wrongdoer's liability should not be reduced by the amount of collateral source payments to an injured plaintiff, even where the nature of the collateral source is a public relief provided to the plaintiff by application of federal or state law.**

*La. Dept. of Transp. & Devel.*, supra at 743. The Supreme Court determined that the victim is not necessarily receiving a "windfall" by the full payment without the deductions paid by other sources, but even if the victim were receiving a windfall, that was preferable to allowing the tortfeasor or wrongdoer to receive a reduction in liability. *Id*. at 743–44. The Court stated that this rule "**does not impose a double burden. The tortfeasor bears only the single burden for his wrong**." *Id*. at 743.

Another case which discusses the collateral source rule is the recent case of *Bozeman v. Louisiana Department of Transportation and Development*, 2003-C-1016 (La. 7/2/04), 879 So.2d 692. In *Bozeman*, the Louisiana Supreme Court found that the only exception to the collateral source rule were a "Medicaid" "write-off" which amounted to a welfare benefit for those with low income and limited assets. *Id*. at 704-705. (emphasis added). However, all other write-offs amounts and payments by "Medicare", social security benefits, insurance companies, pensions, Veteran's Administration hospital services, free medical services rendered as a professional courtesy, sick leave, insurance paid by an employer, suits under the Jones Act and LHWCA, benefits paid by an

employer other than the employer tortfeasor, etc., were subject to the collateral source rule and the tort victim was to collect all of these write-offs and benefits in the damage award. *Id*. at 698-699, 706.

Moreover, various cases have confirmed that in determining the amount of personal consumption to subtract from the loss of support award, one does not use the spouse's income as part of the calculation. The Louisiana Supreme Court in *Cheatham v. City of New Orleans*, 378 So.2d 369, 379 (La. 1979) affirmed a loss of support award where Dr. Melville Wolfson, Shael Wolfson's father, utilized this same methodology. Dr. Melville Wolfson first took the $800 per month that Mr. Cheatham was making and multiplied it by twelve months, which equaled $9,600. *Id*. at 378. He then multiplied this $9,600 per year by thirty-three (33) years, which was Mr. Cheatham's work life expectancy, and this gave him $316,000. *Id*. He then discounted this figure by 5% to calculate the present value which brought the figure to $153,624. *Id*. He then added in a 3% inflation factor and a 3% increase for promotions for the next thirty-three (33) years, which brought the figure to $352,000. *Id*. Finally, he reduced this figure by Mr. Cheatham's personal consumption rate of thirty percent (30%). *Id*. At no point did Dr. Melville Wolfson consider the total family income, as Pharmacia asserts Shael Wolfson should do in this case. The earning capacity of the surviving spouse is not a factor to be considered in the determination of a loss of support award in a wrongful death action. A review of Shael Wolfson's report indicates that this is the same methodology that Shael Wolfson used in calculating his loss of support award. (Exhibit "1" - <u>Deposition of Shael</u>

<u>Wolfson</u>, at Deposition Exhibit 6 - Expert Report of Shael Wolfson, at p. 3, Paragraph 4(a))

Another case on point is *Hogue v. Sussmane-Stubbs, et al.*, No. 34,340 (La. App. 2 Cir. 2/28/01), 780 So.2d 1203. In *Hogue*, the Court noted that the following were factors to be considered when determining an amount to award for loss of support: decedent's earnings at the time of death, age, life expectancy, job security, nature of the work, health prior to accident and work history. *Id*. at 1206. The *Hogue* Court did not state that the surviving spouse's earnings were a factor to be considered in a loss of support award. In fact, in estimating the loss of support, Dr. Ernest Moser, plaintiffs' expert economist, simply reduced plaintiffs' 1996 earnings by a 35% personal consumption rate. *Id*. Dr. Moser did not consider the surviving spouse's income/earning capacity nor did the Court require Dr. Moser to consider the spouse's income/earning capacity. *Id*.

Another case on point is *Masters v. Courtesy Ford Company, Inc.*, No. 32,275, (La. App. 2 Cir. 10/29/99), 758 So.2d 171. In *Masters*, the court again identified the factors that should be considered in awarding loss of support. *Id*. at 194. The earning capacity of the surviving spouse was not among the factors to be considered in awarding loss of support. *Id*. As did Mr. Wolfson, both economists in the *Masters* case reduced the loss of earnings by the deceased's spouse's personal consumption as it applied to the surviving spouse's income, not the total family income. *Id*. For example, Dr. Charles O. Bettinger, plaintiffs' economist, determined that the total loss of earnings and earnings capacity at the time of Mr. Masters' death was $871,347. *Id*. Next, Dr. Bettinger determined that a ten percent (10%) personal consumption rate was appropriate and also determined

that ten percent (10%) of $871,347 was $87,135. *Id*. He then subtracted Mr. Masters' personal consumption by subtracting $87,135 from $871,347 to obtain a total loss of $784,212. At no point was the earning capacity of the spouse taken into consideration nor does Louisiana law require that the spouse's earning capacity be taken into consideration. In fact, the collateral source rule governs that the surviving spouse's income is not considered.

Finally, it is important to point out that Pharmacia only refers this Court to the 2004 income tax returns of Michael and Barbara Catania. Not surprisingly, Pharmacia fails to advise this Court of the income tax returns prior to 2004. As far back as 1998, Michael Catania listed his occupation as "retired" and had $0 in reported business income in 1998, 1999, and 2000. (Exhibit "6" - 1998 Tax Return; Exhibit "7" - 1999 Tax Return; Exhibit "8" - 2000 Tax Return). Mr. Catania reported $3,507 in 2002, $15,207 in 2003 and $42,919 in 2004. (Exhibit "9" - 2002 Tax Return; Exhibit "10" - 2003 Tax Return; Exhibit "11" - 2004 Tax Return). Despite the fact that Mr. Catania's income was minimal from 1998 through 2002, Pharmacia would have this Honorable Court consider only his 2004 tax return in attempts to overestimate the total family income. Using only one year of tax returns is contrary to economic theory, specifically the permanent income hypothesis.[3] If one were to consider the Catanias' total family income from 1998 through 2004, then Michael Catania's

---

[3]The permanent income hypothesis is a theory of consumption that was developed by American economist Milton Freidman, which states that the choices made by consumers regarding their consumption patterns are determined not by current income patterns but by their longer-term income expectations. The key conclusion of this theory is that transitory, short-term changes in income have little effect on consumer spending behavior.

contribution to the "total family income" would only be an average of approximately $10,200 per year. This $10,200 a year increase in the total family income would have little to no effect on the personal consumption factor utilized by Shael Wolfson for a two person household. (Exhibit "4" - Patton-Nelson Article, at p. 299). As such, Mr. Wolfson's opinions with regard to personal consumption are reliable. Moreover, plaintiffs submit that whether or not Mr. Wolfson overestimated or underestimated Barbara Catania's personal consumption should be an issue for the jury to determine based on the evidence which is presented at trial regarding Mrs. Catania's spending habits.

Louisiana law is clear that the earning capacity of the surviving spouse is not a factor to be considered in determining loss of support. Moreover, the collateral source rule governs that the surviving spouse's income is not considered. Additionally, Pharmacia has come forth with no testimony or cases, only attorney argument, which set forth that Shael Wolfson's estimation of Barbara Catania's personal consumption is unreliable. Accordingly, plaintiffs submit that Pharmacia's motion must be denied.

## II.    PHARMACIA'S MOTIONS WITH REGARD TO THE LASERS BENEFITS RECEIVED BY MICHAEL CATANIA ARE MOOT.

The loss of LASERS benefits to which Shael Wolfson referred was not a loss sustained by the survivors of Barbara Catania, but a loss sustained by Barbara Catania herself, as Pharmacia's role in causing Mrs. Catania's death has resulted in her having lost her right to LASERS benefits. The fact that Mr. Catania is receiving death benefits has nothing to do with the fact that Mrs. Catania will

never be able to enjoy the LASERS benefits upon retirement. However, it is important to note that this Honorable Court dismissed plaintiffs' survival action as to Pharmacia Corporation, the Travelers Indemnity Company (and the Travelers Indemnity Company and on behalf of The Travelers Insurance Company, solely as alleged insurers of the Aber Company, Inc.), Royal Indemnity Company (as successor in interest to Queen Insurance Company of America and to Royal Insurance Company of America), and Chemtura Corporation. (Exhibit "5" - Judgment). Accordingly, plaintiffs submit that Pharmacia's motion is moot as it relates to the LASERS benefits, as plaintiffs are not claiming the LASERS benefits as part of Michael Catania and Kristen Catania's wrongful death loss of support claim. The loss of LASERS benefits were only being pursued as part of the survival claim of Barbara Catania. Undersigned counsel has contacted counsel for Pharmacia and advised him of same, and both counsel for Pharmacia and plaintiffs agree that Pharmacia's motion in this regard is moot.

However, out of an abundance of caution, plaintiffs point out that the LASERS benefits may become an issue in the event that plaintiffs choose to appeal and are successful in their appeal of the dismissal of the survival claims of Mrs. Catania. Plaintiffs submit that the LASERS benefits were recoverable as part of the survival action of Mrs. Catania. Pharmacia argued that the LASERS benefits should have been excluded and/or reduced based on the fact that Michael Catania is now received LASERS benefits as a result of his wife's death. However, any LASERS benefits which Michael Catania may be receiving are subject to the collateral source rule. "Under the collateral

source rule, a tortfeasor (Pharmacia) may not benefit, and an injured plaintiff's tort recovery may not be reduced, because of monies received by the plaintiff from sources independent of the tortfeasor's procuration or contribution." *Bozeman v. Louisiana*, 879 So.2d 692, 698 (La. 7/2/04). This is precisely what Pharmacia was attempting to do. Pharmacia was hoping to deduct the amount Michael Catania has received as survivor benefits from the LASERS benefits that Mrs. Barbara Catania would have been entitled to had she not died due to the fault of the various defendants, including Pharmacia. Pharmacia could not obtain a credit based on the retirement pension Mrs. Catania would have received through her employment with LSU, as Pharmacia did not contribute to this pension. *Adam v. Schultz*, 250 So.2d 811 (La. App. 4th Cir. 1971) (where Court found that pension benefits are collateral sources and ultimately rejected defendants' argument that they should be allowed to offset the amount of pension pay the victim received against the amounts they were to pay in damages). Also, in *Reeves v. Gulf States Utilities Co.*, 327 So.2d 671, 677 (La. 1st Cir. 1/12/76) the First Circuit held that defendants were not entitled to diminution of an award for economic damages because of pension benefits to be received by plaintiff from a source which defendants had not contributed. The LASERS benefits are payments received from Mrs. Catania's former employer, not Pharmacia. Accordingly, these benefits were recoverable as part of the survival claim. However, because this Honorable Court has dismissed plaintiffs' survival claim, the issue of whether the LASERS benefits are recoverable is MOOT. Accordingly, plaintiffs submit that Pharmacia's motion as it relates to LASERS benefits should be denied as MOOT.

-16-

### III. SHAEL WOLFSON'S OPINIONS ARE RELIABLE UNDER *DAUBERT*

Notably, no defense expert has certified that the testimony of Dr. Wolfson should be excluded on the grounds that his opinions are unreliable. **Indeed, when all is said and done, the defendants come forward with nothing except lawyers' arguments.** On this basis alone, defendants' motion is fatally defective and must be rejected since obviously defense counsel, however learned in the law, cannot pretend to be qualified in the various fields of economic inquiry here at issue.

The *Daubert* Court set forth several factors for the trial court to consider in determining whether a proffer of expert testimony meets minimum standards of reliability:

    a.      whether the expert's hypothesis <u>can be</u> (and has been) tested;
    b.      whether the expert's theory or technique has been subjected to peer review through publication;
    c.      the theory's known or potential rate for error; and
    d.      whether the theory or technique is generally accepted in the relevant scientific community.

*Daubert v. Merrill Dow Pharmaceutical, Inc.*, 125 L.Ed.2d 469, 113 S.Ct. 2786, 2796-97 (1993). The Court emphasized that the inquiry is flexible, and that the overriding principle is to assure that the testimony is reliable. *Id.*

**"The *Daubert* factors are not a rigid, uncompromising test.** *Daubert*, 113 S.Ct. at 2797. (emphasis added). If the testimony of a proposed expert witness does not satisfy one of the four inquiries, it does **not** automatically make the testimony inadmissible. The trier of fact remains empowered to exercise discretion to admit expert testimony it believes is relevant and constitutes

'pertinent evidence based on scientifically valid principles.' " *Id.* (emphasis added). *See also*, *Young v. Louge*, 660 So.2d 32, 50 (La.App. 4th Cir. 1995), *writ denied*, 664 So.2d 443-444(La. 1995); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002); *McLain v. Tulane Fleeting, Inc.*, 1995 WL 2272 (E.D. La. 1995); *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529 (D.C. Cir. 1984), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545 (1984); *See also Rogers v. Horseshoe Entertainment*, 766 So.2d 595, 605 (La.App. 2nd Cir. 2000), *writ denied*, 776 So.2d 463-464 (La. 2000) ("Each of these [*Daubert*] factors may or may not be relevant to the particular inquiry." *citing Daubert*, *supra* at 593-94); *see also Pipitone*, 288 F.3d at 244.

In conducting a *Daubert* inquiry, the trial court must recognize the distinction between determining the sufficiency of the evidence and determining the admissibility of the evidence. Sufficiency of the evidence concerns whether the plaintiffs have produced enough evidence to convince a reasonable juror that their expert's opinion is correct. *See In Re Paoli RR Yard PCB Litg.*, 35 F.3d 717, 750 (3rd Cir. 1994); *Wells v Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 (11th Cir. 1986), *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986).

A *Daubert* inquiry, in contrast, does not focus on whether the expert's opinion is correct; rather, it focuses on whether the opinion is reliable (*i.e.*, whether it is bases on methods and procedures of science).[4] *Paoli*, 35 F.3d at 744. Thus, the *Daubert* Court cautioned that the focus

---

[4] Federal Rule of Evidence 703 permits an expert, in forming opinions or inferences on the subject, to rely on facts or data which is perceived by or made known to the expert at or before the hearing, if of the type reasonably relied upon by experts in the particular field, the facts or data need not be admissible in evidence for the opinion or inference to be admitted.

of the inquiry should be on the expert's methodologies and principles and not on the conclusions they generate. *Daubert*, 113 S.Ct. at 2797. As the *Paoli* court recognized, moreover, "[t]he evidentiary requirement of reliability is lower than the merits standard of correctness**.**" *Paoli*, 35 F.3d at 744. A judge must often recognize that an expert has good grounds for an opinion even though the judge thinks the opinion is incorrect. *Id.* In this regard, the court should not exclude an expert's opinion simply because a flaw exists in the expert's investigation process which leads the court to conclude the opinion is incorrect. *Id.* at 745. Exclusion is justified only when the flaws are so great that the expert lacks "good grounds" for the opinion**.** *Id.*

The defendants' attempt to prevent a jury from hearing the plaintiffs' entire story, through their *Daubert* argument, has no support in law. Therefore, the court should deny the defendant's motion and allow the testimony of plaintiffs' expert, Shael Wolfson. The record is completely void of any evidence showing that the opinions of Mr. Wolfson are so far out, on, or beyond the fringe of knowledge that they are unreliable. Moreover, lawyer argument is not a basis for such as classification, and lawyer argument is not evidence showing that the opinions of plaintiffs' expert may be unreliable and thereby not meeting the threshold requirement of *Daubert*.

## THE FLEXIBLE *DAUBERT* STANDARD

In determining whether an expert should be allowed to testify, the first source for the court is the Federal Rules of Evidence Rule 702, which provides as follows:

---

Thus, an expert can rely upon inadmissible hearsay in forming his opinions. *U. S. v. Gresham*, 118 F.3d 258, 266 (5th Cir. 1997); *U. S. v. Floyd*, 281 F.3d 1346, 1349 (11th Cir. 2002).

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise....

As recognized by the Supreme Court's decision of *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 125 L.Ed.2d 469, 113 S.Ct. 2786 (1993) (*Daubert*), Federal Rule 702 was intended to liberalize and make less restrictive the admissibility of expert testimony. *Daubert* at 592. The exclusion of expert testimony is limited to those relatively rare occasions when proof is offered in areas that are truly on the uncertain fringes of scientific and technical knowledge. *Daubert* does not come into play at all in the routine matter of expert testimony addressing less extremely controversial subject matters.[5]

By way of background, and as outlined by the Louisiana Supreme Court in *State v. Foret*, 628 So.2d 1116 (La. 1993),

> **In *Daubert*, the court was concerned with determining the admissibility of <u>new techniques as a basis for expert scientific testimony</u>.[6] Formerly, the test for admissibility of expert scientific testimony was based on a "short, citation-free 1928 decision" of... *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923). In *Frye*, the rule for admissibility of expert testimony was delineated as requiring "general acceptance" of a technique in its respective**

---

[5] In the case at bar, "**<u>the evidence" sought to be excluded does not even rise to the questionable level presented in *Daubert*.</u>**" *See McLain v. Tulane Fleeting, Inc.*, 1995 WL 2272 (E.D. La. 1995). Accordingly, in the instant case, <u>we are not dealing with "**junk science**</u>", but a disease which has been known to and recognized by the medical community for many years. Thus, *Daubert* is not applicable to the present case.

[6] *Daubert* was a complex medical case in which a pharmaceutical company was sued for alleged birth defects sustained as a result of the mother's ingestion of an anti-nausea drug.

> **scientific field before the technique is considered admissible....  Finding that "a rigid 'general acceptance' requirement would be at odds with 'the liberal thrust of the Federal Rules'," the [Supreme] court concluded that *Frye's* "austere standard, absent from and incompatible with [this liberal thrust] should not be applied in federal trials.' __ U.S. at ___, 113 S.Ct. 2794.**

*State v. Foret*, 628 So.2d 1116, 1121-22 (La. 1993) (emphasis added); *Daubert*, 113 S.Ct. at 2794.  In rejecting the "austere standard" of *Frye*, the unanimous Court in *Daubert* recognized that the adoption of the Federal Rules of Evidence 702 entirely replaced and superseded common law rules with a liberal statutory scheme which relaxed "the traditional barriers to opinion testimony."  *Daubert*, 113 S.Ct. at 2794; *accord In Re Paoli RR Yard PCB Litg.*, 35 F.3d 717, 750 (3rd Cir. 1994) ("*Paoli*") (the Federal Rules of Evidence display a preference for admissibility).  "This relaxation is justified so long as the **expert's opinion (has) a reliable basis in the knowledge and experience of his discipline**."  (emphasis added).  *State v. Foret*, 628 So.2d 1116, 1122 (La. 1993) (*citing Daubert*, 509 U.S. at 590, 113 S.Ct. at 2796).  "**This new standard serves to <u>remove some of the barriers</u> in the admission of expert testimony in many fields...**"(emphasis added).  *Foret*, 628 So.2d at 1123 (La. 1993); *Daubert*, 113 S.Ct. at 2794.  Indeed, in *Daubert*, Justice Blackman made clear that vigorous cross-examination and the testimony of opposing experts is the traditional and proper means for an adversary to attack the suggestedly weak or questionable opinions of even marginally qualified experts.  *Daubert*, 113 S.Ct. at 2798.

"In *Daubert*, the Supreme Court offered an illustrative , but not an exhaustive, list of

factors that district courts may use in evaluating the reliability of expert testimony . . . . [T]he Supreme Court emphasized that the *Daubert* analysis is a '<u>flexible</u>' one, and that 'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' " *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)**.** Thus, contrary to the assertions made by the defendant, the *Daubert* inquiry (which is conducted by the district judge) is flexible, and the admission of expert testimony is totally within the judge's discretion. Also, in the comments following the 2000 Amendment to the Federal Rules of Evidence Rule 702, the commenters noted that "a review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." *See* Fed. R. Evid. 702, 2000 Amendments (unnumbered) ¶ 6. While the comments are not authoritative, they do often serve to shed light on the rules themselves and the interpretations thereof.

In the case at bar, the defendant is afraid to put plaintiffs' expert to cross-examination and wants the Court to make the determination that they should not testify at all. Such a request must be viewed with the harshest skepticism. This skepticism is heightened by the flagrant absence in the defendant's motion of any evidence, articles, or proof that plaintiffs' expert is mistaken, (which would only create a jury question), or that these expert's opinions are so far out, on, or beyond the fringe of scientific knowledge that a court must summarily reject them. In true *Daubert* motions, seriously made, it is customary for the moving parties to come forward with

massive proof from preeminent experts, conclusively demonstrating that their opponents' expert proofs are so unreliable as to constitute "junk science." The defendant in the instant case presents no such evidence.

In *Zuchozicz v. United States*, 140 F.3d 381 (2nd Cir. 1998), the court approved the admission of a pulmonary medical expert's opinion that a negligent overdose of Danocrine had been responsible for the pulmonary disease related death of the plaintiff's wife. The doctor based his opinion on the temporal relationship between the overdose and the start of the disease, the deceased's apparent good health prior to the overdose, and the differential etiology method of excluding other possible causes. *Id.* at 385. He also testified that Mrs. Zuchowicz's illness was similar in onset, timing and course of development to other cases of pulmonary diseases known to have been caused by other classes of drugs. *Id.* at 385-86. There had been no scientific tests to determine the effects of dosages at the level received by Mrs. Zuchowicz, and the doctor's opinion as to medical causation, based solely on clinical medical methodology, was not confirmed by any hard science or strict *Daubert* factor evidence**.** *See Ambrosini v. Labarraque*, 101 F.3d 129, 138 (D.C. Cir. 1996) (stating that the fact that a case may be the first of its type should not prevent a plaintiff's doctor from testifying as to causation); *see also Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002).

In *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2nd Cir.1995), the court rejected the defendant's argument for exclusion of a clinical physician's opinion, as scientifically unfounded, that glue fumes caused the plaintiff's respiratory symptoms and throat polyps. The doctor's opinion was based entirely upon his use of clinical medical methodology, without any hard

science or strict *Daubert* factor related basis.  The doctor could not point to a single piece of

medical literature that said that glue fumes cause throat polyps**.**  In describing the doctor's use of

clinical medical methodology as vouching for the reliability of his opinion, the court stated:

> [Dr.] Fagelson based his opinion on a range of factors, including his care and
> treatment of McCullock; her medical history (as she related it to him and as
> derived from a review of her medical and surgical records); pathological studies;
> review of Fuller's MSDS; his training and experience; use of scientific analysis
> know as differential etiology…, and reference to various scientific and medical
> treatises.  Disputes as to the strength of his credentials, faults in his use of
> different etiology as a methodology, or lack of textual authority for his opinion, go
> to the weight, not the admissibility, of his testimony.

*McCullock*, *supra* at 1044.  Thus, the district court properly admitted Fagelson's testimony.

In the case of  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002), the District Court

had excluded the testimony of Dr. Jeffrey Coco, M.D., for allegedly failing the *Daubert* analysis.

Reviewing the exclusion of Dr. Coco on appeal, the U.S. Fifth Circuit Court of Appeals held that

the District Court had abused its discretion in excluding Dr. Coco's testimony and reversed the

trial court's decision.  The Fifth Circuit stated that Dr. Coco "did not test his hypothesis"; "did

not conduct an epidemiological study"; "did conduct a literature search and found no evidence of

a salmonella infection arising from any injectable knee product"; and "there is no known or

potential rate of error or controlling standard associated with Dr. Coco's hypothesis." *Pipitone*,

288 F.3d at 246.  Basically, Dr. Coco passed none of the factors highlighted in *Daubert*.

Nonetheless, the *Pipitone* Fifth Circuit noted that Dr. Coco was a specialist in infectious

diseases and was employed by three local hospitals in this area of medicine.  Dr. Coco has been

on the Specialty Board of Infectious Diseases and has written on the subject.  Dr. Coco was a

Clinical Assistant Professor at Louisiana State University School of Medicine for the last twelve years. Dr. Coco drew on this experience when he examined Pipitone, and based on his medical experience, Dr. Coco concluded that the most likely cause of Pipitone's infection was the Synvisc that had been injected into his knee two days before the development of the infection. The *Pipitone* court pointed out that the *Daubert* analysis was a flexible one, and that Dr. Coco's opinion and testimony were both relevant and reliable. *Pipitone*, 288 F.3d at 244-49. Thus, U.S. Fifth Circuit Court of Appeals reversed the trial court's decision, and held that Dr. Jeffrey Coco was qualified to testify pursuant to *Daubert*. *Pipitone*, 288 F.3d at 250.

WHEREFORE, plaintiffs respectfully submit, for the reasons stated above, that Pharmacia's Motion to Exclude Shael Wolfson's Opinions and Motion for Partial Summary Judgment on Economic Damages, be denied.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on the 6th day of October, 2009, the foregoing Opposition to Pharmacia's Motion to Exclude Shael Wolfson's Opinions and for Partial Summary Judgment on Economic Damages, was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the court's electronic filing system. I also certify that I have mailed by United States Postal Service this filing to any non-CM/ECF participants.

_____/s/ Jonathan B. Clement_____
JONATHAN B. CLEMENT

Respectfully submitted,

**ROUSSEL & CLEMENT**

/s/ Jonathan B. Clement
GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
KELLY C. FOGLEMAN - 31646
1714 Cannes Drive
LaPlace, LA. 70068
TELEPHONE: (985) 651-6591
FAX: (985) 651-6592
ATTORNEYS FOR PETITIONERS:
MICHAEL CATANIA AND KRISTEN CATANIA